**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Collin Schlotterer, | No. CV-22-0326-TUC-EJM |
| Plaintiff, | |
| v. | **ORDER** |
| Kilolo Kijakazi, Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff Collin Schlotterer's Opening Brief (Doc. 16).  Defendant filed her Answering Brief ("Response") (Doc. 17), and Plaintiff replied ("Reply") (Doc. 18).  Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  Compl. (Doc. 1).  Based upon the pleadings of the parties and the administrative record submitted to the Court, the undersigned grants Plaintiff's Opening Brief (Doc. 16) and reverses and remands the Commissioner's decision.

## I.      BACKGROUND

### A.      *Procedural History*

On January 13, 2020, Plaintiff protectively filed a Title XVI application for Supplemental Security Income ("SSI"), alleging disability as of January 1, 2018, due to Addison's disease, autoimmune polyglandular syndrome type 2, diabetes mellitus type 1, hypothyroidism, and left knee surgery including a torn meniscus, Antero cruciate ligament,

and bone fragments.  *See* Administrative Record ("AR") at 13, 15, 20, 88–90, 102–104, 206, 209, 211, 228, 243, 264, 278, 280.[1]  The Social Security Administration ("SSA") denied this application on April 9, 2020.  *Id.* at 13, 88–101, 119–27.  On June 8, 2020, Plaintiff filed a request for reconsideration, and on July 13, 2020,[2] SSA denied Plaintiff's applications upon reconsideration.  *Id.* at 13, 102–16, 134, 136–44.  On August 25, 2020, Plaintiff filed his request for hearing.  *Id.* at 13, 145–48.  On March 26, 2021, a telephonic hearing was held before Administrative Law Judge ("ALJ") Yasmin Elias.  AR at 13, 26–43.  On June 4, 2021, the ALJ issued an unfavorable decision.  *Id.* at 10–20.  On July 30, 2021, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on July 12, 2022, review was denied.  *Id.* at 1–6, 311–13.  On July 26, 2022, Plaintiff filed this cause of action.  Compl. (Doc. 1).

### B.   Factual History

Plaintiff was eighteen (18) years old at the time of the alleged onset of his disability and twenty-one (21) years old at the time of the administrative hearing.  AR at 13, 19–20, 26, 44–45, 52–53, 69–70, 88–90, 102–104, 186, 206, 209, 211, 228, 231, 264, 280. Plaintiff completed the eleventh grade.  *Id.* at 40, 44, 52, 69, 88, 102, 244.  Prior to his alleged disability, Plaintiff worked as a warehouse worker, stocking and cleaning for a battery distributor.  *Id.* at 235–36, 244–45, 256–57.

### 1.  Plaintiff's Testimony

#### a.  Administrative Hearing

Plaintiff testified that his diabetes and Addison's "aren't always on the same page" and require constant monitoring.  AR at 32–33.  Plaintiff explained if he is doing physical work, he needs to be extra cautious regarding his blood sugar, followed by making sure that his Addison's does not flare the following day.  *Id.*  Plaintiff noted that if he does a lot of physical activity one day, he is unable to work the following day and requires rest

---

[1] Page numbers refer to the page numbers demarcated in the Administrative Record rather than the Court's Case Management/Electronic Case Files ("CM/ECF") page numbers.

[2] The forms indicate that the SSA adjudicators denied Plaintiff's claim on July 10, 2020; however, the letters notifying Plaintiff of the denial are dated July 13, 2020.

otherwise he risks hospitalization. *Id.* Plaintiff described the physical labor he had been doing as landscaping around his family's property. *Id.* at 33–34. Plaintiff further described a typical day working in the yard to include doing approximately four (4) hours of work before lunch, then he takes a break for an hour or two and checks his blood sugar, as well as monitors how he is feeling. *Id.* at 34. Plaintiff indicated that if he is not having cramps, stomach issues, or a migraine, he will be sure to hydrate and return to do more work outside, otherwise he will stop and rest. AR at 34. Plaintiff reported that he does this approximately two (2) or three (3) times per week. *Id.* Plaintiff further noted that if his blood sugar gets high, then he has to take steroids and stay in bed for the following day, as well as monitor his blood pressure and blood sugar. *Id.* at 35.

Plaintiff described non-emergency days where he is able to relax and listen to the radio; however, he has more difficulty controlling his blood sugar on those days because his diabetes generally requires some physical activity for management. *Id.* at 36. Plaintiff explained that his conditions require round-the-clock monitoring and management. *Id.* at 37–38. Plaintiff reported a typical twenty-four (24) hour period involves a midnight check of his blood sugar, a 4:00 a.m. blood sugar check, 6:00 a.m. blood sugar check and taking thyroid medicine, 7:00 a.m. blood sugar check and taking steroids, 9:00 a.m. blood sugar check and taking long-acting insulin plus more steroids (he also takes a stress dose at breakfast), then he checks his blood sugar every one and a half (1 ½) to two (2) hours, eats lunch and takes a stress dose, continues to monitor his blood sugar levels every one and a half (1 ½) to two (2) hours, eats dinner and takes another steroid, at 9:00 p.m. he checks his blood sugar again and depending on what the levels are can sleep until midnight or else needs to eat something and stays up until his levels are good. AR at 37–38.

Plaintiff noted that he has noticed a decline in cognitive function, including problem-solving and vocabulary in conversation, due to his past hospitalizations. *Id.* at 33. Plaintiff testified that prior to COVID-19 he was going to the hospital for either adrenal crisis or diabetic ketoacidosis ("DKA") almost every week. *Id.* at 39. Plaintiff noted that because of his risks with COVID, he has been trying to avoid the hospital. *Id.* at 38.

Plaintiff also noted that he has been doing better here because things are much less stressful. *Id.*

### b. Administrative Forms

#### i. *Work History Report*

On February 14, 2020, Plaintiff completed a Work History Report.  AR at 256–58. Plaintiff listed his prior work to include warehouse worker at a battery supply store between October and December of 2018.  *Id.* at 256.  Plaintiff described this position as parttime— five (5) hours per day, five (5) days per week.  *Id.* at 257.  Plaintiff indicated that the job included moving batteries around the warehouse, sweeping, general warehouse cleaning (*e.g.*, bathrooms), and assisting customers with installing batteries.  *Id.*  Plaintiff reported that he used machines, tools, or equipment and wrote, completed reports, or performed similar duties, but did not use technical knowledge or skill.  *Id.*  Plaintiff reported that he handled, grabbed, or grasped large objects eight (8) hours per day; stood, knelt, stooped, or reached four (4) hours per day; walked for three (3) hours per day; crouched, wrote, typed, or handled small objects for two (2) hours per day; and sat for one (1) hour per day. AR at 257.  Plaintiff noted that he lifted batteries from one end of the warehouse to the other, which was approximately the length of a football field, multiple times daily.  *Id.* Plaintiff further reported that the heaviest weight that he was required to lift was fifty (50) pounds.  *Id.*  Plaintiff denied any supervisory responsibilities and was not a lead work or have any role in hiring or firing employees.  *Id.*

#### ii. *Exertional Daily Activities Questionnaire*

On December 3, 2019, Plaintiff completed a Function Report—Adult.  AR at 251– 55.  Plaintiff reported that he lived in a house with family.  *Id.* at 251.  Plaintiff described his average day to include assisting with light chores around the house, resting due to fatigue from his medical issues, and monitoring and managing his blood sugars and treating them as needed.  *Id.*  Plaintiff described the symptoms of his medical conditions as follows:

> Fatigue is [a] big problem.  Steroids make sleep difficult and even simple tasks like dishes can make me very tired to [the] point that I have to sit. Sometimes I can do a task but won't get tired until later.  Everything depends

on the task, what time of day, how my blood sugar is[,] etc.

*Id.*  Plaintiff noted that he has to go up three (3) flights of stairs for his doctor's appointments, which takes him a few minutes, and he has to stop occasionally.  *Id.*  Plaintiff reported that he assists his mother with carrying groceries on a weekly basis, and will otherwise help out as needed and as his body allows.  AR at 252.  Plaintiff also reported that he does his own laundry, although he needs to do it in stages or else he gets too tired.  *Id.*  Plaintiff also indicated that he does dishes, which takes approximately thirty (30) minutes.  *Id.*  Plaintiff stated that he has difficulty finishing chores when he has blood sugar issues, which can take up to an hour to resolve, as well as when he has symptoms from his Addison's disease, which may take only thirty (30) minutes to resolve.  *Id.*

Plaintiff denied driving a car.  *Id.*  Plaintiff reported that he visits with friends occasionally and tries to get out of the house at least once per week, if his medical conditions allow.  AR at 252.  Plaintiff indicated that prior to his disability, he was able to "help[] a lot more because [his] body could keep up with the physical parts."  *Id.*  Plaintiff noted that he has lost a lot of weight, which makes it more difficult for him to keep up.  *Id.*  Plaintiff reported that he generally only gets three (3) to four (4) hours of sleep per night.  *Id.*  Plaintiff further reported that he requires naps at least twice per day, with each lasting up to three (3) hours.  *Id.*

Plaintiff's medications include Dexamethasone, Fludrocortisone, Hydrocortisone, Levothyroxine, Pantoprazole, Sucralfate, and Lantus.  *Id.* at 254–55.

## 2.  Vocational Expert Joseph Henry Torres' Testimony

Mr. Torres testified as a vocational expert at the administrative hearing.  AR at 13, 39–43, 186–88, 303–305.  Because the ALJ found that Plaintiff did not have any past relevant work, Mr. Torres did not describe any of his prior positions.  *Id.* at 40.  The ALJ asked Mr. Torres to consider a hypothetical individual of Plaintiff's age, education, and without prior relevant work; who could sit, stand, or walk for six (6) hours out of an eight (8) hour day; frequently lift and carry twenty (20) pounds and occasionally twenty-five (25) pounds; frequently climb ramps and stairs; occasionally climb ladders, ropes or

scaffolds; work in an environment without frequent exposure to extreme cold or work hazards, and with less than occasional exposure to extreme heat. *Id.* at 40–41. Mr. Torres opined that at the medium exertional level, such an individual would be employable as a laundry laborer, Dictionary of Occupational Titles ("DOT") number 361.687-018, with a Specific Vocational Preparation ("SVP") of 2, medium exertional level, and of which there are approximately 123,000 positions in the national economy. *Id.* at 41. Mr. Torres further opined that such an individual would be able to perform a janitorial position, DOT number 381.687-018, medium exertional level, with an SVP of 2, and approximately 338,000 positions in the national economy. *Id.* Mr. Torres also opined that such an individual would be employable as a warehouse worker, DOT number 922.687-058, medium exertional level, with an SVP of 2, and of which there are approximately 378,000 jobs in the national economy. AR at 41.

Mr. Torres confirmed that there would also be jobs available at the light exertional level. *Id.* Mr. Torres opined that such an individual would be employable as an assembler of small products, DOT number 706.684-022, with an SVP of 2, light exertional level, and of which there are approximately 195,000 positions in the national economy. *Id.* Mr. Torres further opined that such an individual would be able to perform the job of packer, DOT number 920.687-166, light exertional level, with an SVP of 2, and approximately 298,000 positions in the national economy. *Id.* Mr. Torres also opined that such an individual would be employable in housekeeping, DOT number 323.687-014, light exertional level, with an SVP of 2, and of which there are approximately 375,000 jobs in the national economy. *Id.*

Mr. Torres indicated that any of these employers would tolerate no more than ten (10) percent of the time off-task. AR at 42. Mr. Torres further explained that during the probationary period, which is between approximately thirty (30) to sixty (60) days, an employee would be allowed to be absent one (1) day per month. *Id.* Mr. Torres opined that any absenteeism in excess of that would be preclusive. *Id.*

Mr. Torres confirmed that his testimony was consistent with the DOT, with the

exception of time off-task in the workplace.  *Id.*  Mr. Torres explained that issue is not specifically addressed in the DOT, and his responses were based on his education and experience in this field.  *Id.*

### 3.  Plaintiff's Medical Records[3]

On January 27, 2019, Plaintiff was seen by Terry Vondrak, M.D. at Arizona Community Physicians.  AR at 341–42.  On January 30, 2019, Plaintiff was seen at the Banner University Medical Center ("Banner UMC") Emergency Department ("ED") for increased fatigue, increased low blood sugar, stomach pain, nausea, and dark coloring on his knuckles.  *Id.* at 455–62.  Plaintiff also reported moderately severe epigastric abdominal pain, with diarrhea, nausea, and dizziness.  *Id.* at 455.  Plaintiff was given intravenous fluids and steroids, as well as Tylenol and an anti-nausea medication.  *Id.* at 456.  Plaintiff reported an improvement in his symptoms following this intervention.  *Id.*

On March 14, 2019, Plaintiff was seen by Cindy Neng-Chi Chin, M.D. for a check-up.  AR at 358–66.  Treatment records reflect that "[t]he family has noticed some skin darkening but improved[,] [and] [n]o salt-craving."  *Id.* at 359.  Plaintiff reported he has been feeling cold, especially his scalp, and his hair is falling out in clumps.  *Id.* Dr. Chin's examination of Plaintiff noted less dramatic weight loss, some constipation and diarrhea, scaling on Plaintiff's scalp, mild lipohypertrophy in bilateral abdomen, and bronzing on skin.  *Id.* at 360–61.  Dr. Chin reviewed Plaintiff's blood work and noted a decreased hemoglobin A1c, but increased insulin because it remained above the target, stable Addison's disease, and a plan to start medication for Plaintiff's abnormal thyroid.  *Id.* at 363–66.

On March 20, 2019, Plaintiff's blood work showed slightly elevated thyroid stimulating hormone ("TSH") and elevated Adrenocorticotropic hormone ("ACTH").  AR at 355–56.  Plaintiff's medications were adjusted accordingly.  *Id.* at 355.

On May 23, 2019, Plaintiff was seen at the Banner UMC ED for abdominal

---

[3] Although the Court has reviewed the entirety of Plaintiff's medical records, its summary is generally limited to records following his alleged onset date of January 1, 2018.

1    cramping, nausea, and darkened skin. *Id.* at 448–54. Plaintiff was treated with intravenous

2    fluids and steroids which significantly improved his symptoms. *Id.* at 449.

3              On August 6, 2019, Plaintiff was seen at the Banner UMC ED for fatigue, nausea,

4    shortness of breath, hypoglycemia, diffuse joint pain, darkening skin, and abdominal pain.

5    *Id.* at 441–47. Plaintiff reported that "he has had similar symptoms when diagnosed with

6    adrenal crisis previously." *Id.* at 441. After consultation with pediatric endocrinology,

7    Plaintiff's stress dose hydrocortisone was increased and his Levemir dose decreased. AR

8    at 442. This intervention resulted in significant improvement in Plaintiff's symptoms. *Id.*

9    On August 22, 2019, Plaintiff was seen at the Banner UMC ED for shortness of breath and

10   abdominal pain. *Id.* at 430–37. Plaintiff also reported darkening of his scars, knuckles,

11   and gums, and "that he typically has [all] these symptoms that proceed his adrenal

12   insufficiency/adrenal crisis." *Id.* at 430. Based on his laboratory results, Plaintiff did not

13   require hospital admission, but was to be seen in pediatric clinic later the same day for an

14   adjustment to his medications. *Id.* at 431–32.

15             On November 23, 2019, Plaintiff was seen at the Banner UMC ED for nausea and

16   vomiting. AR at 379–429. Plaintiff reported "some generalized abdominal tenderness[,]

17   [and] [was] noted to have had diaphoresis/chills." *Id.* at 379. Plaintiff was given fluids

18   and his abdominal pain showed improvement, as did his hyperglycemia and vomiting. *Id.*

19   at 379–81. Plaintiff was admitted, stabilized, and discharged on November 27, 2019. *Id.*

20   at 379–429. Plaintiff's nausea and vomiting were noted to be likely secondary to DKA.

21   *Id.* at 399.

22             On December 6, 2019, Plaintiff was seen by Dr. Chin for a final visit prior to

23   transitioning to adult care. AR at 346–54. Treatment records reflect Plaintiff's

24   hospitalization approximately one and a half weeks prior due to DKA and adrenal crisis.

25   *Id.* at 347. Dr. Chin noted that Plaintiff had not had any unexplained nausea or lethargy

26   due to his Addison's disease since he was discharged from the hospital, but he was also on

27   stress-dosing of hydrocortisone. *Id.* Dr. Chin also reported that Plaintiff's hair was falling

28   out in clumps as a result of his thyroid issues. *Id.* at 348. Regarding his Type 1 diabetes,

Dr. Chin noted issues with global hyperglycemia which requires an increased Lantus dose, some days with some decrease indicating insulin administration, and post-prandial hyperglycemia which requires a change in insulin to carb ratio. *Id.* Dr. Chin also indicated a concern regarding Plaintiff's rapid decrease in glucose level overnight, and noted that the "rapid drop in blood sugars make him feel terrible." AR at 348. Dr. Chin's review of Plaintiff's systems was generally unremarkable. *Id.* at 348–49. Dr. Chin's physical examination showed moderate lipohypertrophy on Plaintiff's bilateral abdomen, but was otherwise unremarkable. *Id.* at 349. Dr. Chin observed that Plaintiff's hemoglobin A1c had increased indicating worsening metabolic control. *Id.* at 352. Among other instructions, Dr. Chin modified Plaintiff's modified Plaintiff's insulin, carbohydrate ration, directed him to avoid the lumps on his abdomen, and modified the medications for his Addison's disease. *Id.* at 352–53.

On January 6, 2020, Plaintiff was seen at Arizona Gastroenterology regarding abdominal pain. AR at 343–45. Lisa Medeiros, CRNP, ordered an esophagogastroduodenoscopy ("EGD") with biopsy. *Id.* at 344. On January 10, 2020, Plaintiff was seen by Juan Pablo Galvez, M.D. at Banner Health Endocrinology for evaluation regarding his polyglandular autoimmune syndrome type 2, hypothyroidism, Addison's disease, and type 1 diabetes mellitus. *Id.* at 325–29. Treatment records reflect his diagnoses since his diagnosis in 2014, as well as his medication regime. *Id.* at 325–26. Dr. Galvez's review of Plaintiff's systems and physical examination was unremarkable. *Id.* at 327. Upon review of Plaintiff's laboratory findings, Dr. Galvez assessed poorly controlled diabetes mellitus, uncontrolled hyperglycemia, and that Plaintiff metabolizes the dexamethasone used to control his Addison's disease quickly. AR at 328–29. Dr. Galvez made recommendations regarding diet, exercise, and medication management, to help Plaintiff improve his glycemic control. *Id.* at 328.

On February 12, 2020, Plaintiff was evaluated by Dr. Vondrak for a wellness exam and follow-up regarding Plaintiff's Addison's disease, diabetes mellitus, and hypothyroidism. *Id.* at 338–40. Dr. Vondrak recommended that Plaintiff needed to modify

his diet because he was underweight. *Id.* at 338. Treatment records also note that Dr. Vondrak encouraged decreasing stress and continuing regular aerobic exercise. *Id.* On February 14, 2020, Plaintiff underwent an upper GI endoscopy. AR at 367–75, 485, 493. Treatment records indicate that Plaintiff's mother provided his complicated health history. *Id.* at 485, 493, 500, 507. Records further reflect that Plaintiff "[c]an walk up 2 flights of stairs w/o cp, but will sob towards the end." *Id.* Oleh Haluszka, M.D. reported Plaintiff's examined esophagus was normal, as well as his stomach, but noted "[d]iffuse moderate mucosal changes characterized by granularity, punctuated with white spots and scalloping . . . in the duodenal bulb, in the second portion of the duodenum, and in the third portion of the duodenum." *Id.* at 367, 373. Dr. Haluszka biopsied these areas, as well as Plaintiff's stomach. *Id.* On February 27, 2020, Plaintiff returned to Dr. Vondrak for acute bronchitis. AR at 469–70.

On May 15, 2020, Plaintiff saw Dr. Galvez regarding his polyglandular autoimmune syndrome type 2, hypothyroidism, Addison's disease, and Type 1 diabetes mellitus. *Id.* at 471–76, 532–36. Dr. Galvez "[n]oted overall hyperglycemia, worse as day progresses." *Id.* at 476, 536. Dr. Galvez adjusted Plaintiff's Lantus dosage in an effort to stabilize glucose levels. *Id.*

On July 2, 2020, Plaintiff returned to Dr. Galvez regarding his polyglandular autoimmune syndrome type 2, hypothyroidism, Addison's disease, and Type 1 diabetes mellitus. *Id.* at 526–31. Plaintiff's A1c remained high, and his diabetes was noted to be poorly controlled. AR at 530. Dr. Galvez adjusted his medications. *Id.*

On October 23, 2020, Plaintiff saw Dr. Galvez regarding his polyglandular autoimmune syndrome type 2, hypothyroidism, Addison's disease, and Type 1 diabetes mellitus. *Id.* at 521–25. Plaintiff's A1c was 10.3, down from his previous reading, but still high. *Id.* at 521, 525. Dr. Galvez noted that Plaintiff's diabetes remained poorly controlled. *Id.* at 525. Dr. Galvez adjusted Plaintiff's medications and recommended changes to his diet composition. *Id.*

On January 22, 2021, Plaintiff was seen by Sara Tariq, M.D. at Banner

1    Endocrinology.  AR at 488–90.  Dr. Tariq modified Plaintiff's insulin dosages.  *Id.* at 490.

2    On February 7, 2021, Plaintiff returned to Dr. Tariq for evaluation.  *Id.* at 518–20.

3    Treatment records reflect that Plaintiff had been having blood sugar lows for the prior two

4    (2) weeks.  *Id.* at 518.  Between midnight and 4:00 a.m., Plaintiff's blood sugar drops to

5    between 40–50.  *Id.* at 519.  Dr. Tariq readjusted his medications and made diet

6    recommendations.  AR at 519–20.

7    On March 4, 2021, Plaintiff saw Judy Krentzel, N.P. at Banner Endocrinology.  *Id.*

8    at 503–504, 508–509, 511–16.  Plaintiff reported that he and his family "recently moved

9    to a very rural location and he is much more active as he is outside working much of the

10   day."  *Id.* at 512.  Treatment records reflect that he "will become hypoglycemic very

11   easily." *Id.*   Plaintiff was having approximately two (2) hypoglycemic episodes per week,

12   which was much improved; however, his symptoms include cognitive changes, feeling

13   goofy or drunk-ish, and slurring his words.  *Id.*  NP Krentzel noted that Plaintiff's diabetes

14   was poorly controlled and readjusted his medications, and diet accordingly.  AR at 514–

15   15.

16

17   **II.    STANDARD OF REVIEW**

18   The factual findings of the Commissioner shall be conclusive so long as they are

19   based upon substantial evidence and there is no legal error.  42 U.S.C. §§ 405(g),

20   1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).  This Court may

21   "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

22   findings are based on legal error or are not supported by substantial evidence in the record

23   as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see*

24   *also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).  "Under

25   the substantial evidence standard, a court looks to an existing administrative record and

26   asks whether it contains 'sufficien[t] evidence' to support the agency's factual

27   determinations."  *Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (citations omitted)

28   (alterations in original).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'"  *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III.    ANALYSIS

### A.    *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process is defined as follows:  Step One asks is the claimant "doing substantial gainful activity[?]"  20 C.F.R. § 404.1520(a)(4)(i).  If yes, the claimant is not disabled.  Step Two considers if the claimant has a "severe medically determinable physical or mental impairment[.]"  20 C.F.R. § 404.1520(a)(4)(ii).  If not, the claimant is not disabled.  Step Three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.  20 C.F.R. § 404.1520(a)(4)(iii).  If not, the claimant is not disabled.  Step Four considers the claimant's residual functional capacity and past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If claimant can still do past relevant work, then he or she is not disabled.  Step Five assesses the claimant's residual functional capacity, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If it is determined that the claimant can make an adjustment to other work, then he or she is not

1     disabled.  *Id.*

2          In the instant case, the ALJ found that Plaintiff had not engaged in substantial

3     gainful activity since his application date of January 13, 2020.  AR at 15.  At step two of

4     the sequential evaluation, the ALJ found that "[t]he claimant has the following severe

5     impairments: Addison's disease and diabetes mellitus (416.920(c))."  *Id.*  At step three, the

6     ALJ further found that "the claimant does not have an impairment or combination of

7     impairments that meets or medically equals the severity of one of the listed impairments in

8     20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)."  *Id.*

9     at 17.  Prior to step four and "[a]fter careful consideration of the entire record," the ALJ

10    determined that "the claimant has the residual functional capacity to perform light work as

11    defined in 20 CFR 416.967(b) except he can lift or carry 20 pounds frequently and 25

12    pounds occasionally[;] . . . can frequently climb ramps, stairs, ladders, robes, or scaffolds[;]

13    . . . [and] can work in an environment without frequent exposure to extreme cold or work

14    hazards and less than occasional exposure to extreme heat."  *Id.*  At step four, the ALJ

15    found that "[t]ransferability of job skills is not an issue because the claimant does not have

16    past relevant work (20 CFR 416.968)."  *Id.* at 19.  At step five, the ALJ found that after

17    "[c]onsidering the claimant's age, education, work experience, and residual functional

18    capacity, there are jobs that exist in significant numbers in the national economy that the

19    claimant can perform (20 CFR 416.969 and 416.969(a))."  AR at 19.  Accordingly, the ALJ

20    determined that Plaintiff was not disabled.  *Id.* at 20.

21         **B.     *Plaintiff's Symptom Testimony***

22         Plaintiff asserts that the ALJ failed to "articulate clear and convincing reasons to

23    discount Mr. Schlotterer's symptom testimony[.]" Opening Br. (Doc. 16) at 7–11.  Plaintiff

24    further argues that "[t]he ALJ's discussion of symptom testimony neglects to explain how

25    any individual factor either supports or undermines Mr. Schlotterer's contentions that his

26    necessary monitoring and medication schedule and the carful balancing of Addison's and

27    diabetes symptoms, of hypo- and hyperglycemia, occupy his life to a degree incompatible

28    with work on a regular and continuing basis." *Id.* at 8–9.  Defendant posits that "[t]he ALJ

1   articulated valid reasons for discounting Plaintiff's subjective complaints, in accordance

2   with the applicable regulations and caselaw[.]" Response (Doc. 17) at 4. The Court agrees

3   with Plaintiff.

### 1.  Legal Standard

5       An ALJ must engage in a two-step analysis to evaluate a claimant's subjective

6   symptom testimony. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007). First,

7   "a claimant who alleges disability based on subjective symptoms 'must produce objective

8   medical evidence of an underlying impairment which could reasonably be expected to

9   produce the pain or other symptoms alleged[.]'" *Smolen v. Chater*, 80 F.3d 1273, 1281–

10  82 (9th Cir. 1996) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*)

11  (internal quotations omitted)); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir.

12  2014). Further, "the claimant need not show that h[is] impairment could reasonably be

13  expected to cause the severity of the symptom []he has alleged; []he need only show that it

14  could reasonably have caused some degree of the symptom." *Smolen*, 80 F.3d at 1282

15  (citations omitted); *see also Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "Nor

16  must a claimant produce 'objective medical evidence of the pain or fatigue itself, or the

17  severity thereof.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting

18  *Smolen*, 80 F.3d at 1282). "[I]f the claimant meets this first test, and there is no evidence

19  of malingering, 'the ALJ can reject the claimant's testimony about the severity of h[is]

20  symptoms only by offering specific, clear and convincing reasons for doing so.'"

21  *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1281); *see also Burrell v.*

22  *Colvin*, 775 F.3d 1133, 1137 (9th Cir. 2014) (rejecting the contention that the "clear and

23  convincing" requirement had been excised by prior Ninth Circuit case law). "This is not

24  an easy requirement to meet: 'The clear and convincing standard is the most demanding

25  required in Social Security cases.'" *Garrison*, 759 F.3d at 1015 (quoting *Moore v. Comm'r*

26  *of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).

27       SSR 16-3p[4] states, in relevant part:

28  _____

[4] Social Security Rulings are "binding on all components of the Social Security

We will not evaluate an individual's symptoms based solely on objective medical evidence unless that objective medical evidence supports a finding that the individual is disabled.  We will evaluate an individual's symptoms based on the evidence in an individual's record as described below; however, not all of the types of evidence described below will be available or relevant in every case.

\* \* \*

In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent."  It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, *available at* 2017 WL 5180304, at \*5, 10 (October 25, 2017).

### 2. Analysis

The ALJ acknowledged the two-step process for assessing Plaintiff's symptom testimony.  AR at 17–18.  Next, the ALJ described Plaintiff's responses on the administrative forms and recounted his hearing testimony.  *Id.* at 18.  The ALJ then concluded "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  *Id.* at 18.  The ALJ went on to review Plaintiff's medical records and other evidence in the file.  *See id.* at 18–19.

The ALJ further acknowledged Plaintiff's November 2019 hospitalization for DKA

---

Administration."  20 C.F.R. §§ 402.35(b)(1) and (2); *Heckler v. Edwards*, 465 U.S. 873 n.3 (1984).

and adrenal crisis, but then stated "[h]e experienced no unexplained nausea or lethargy since the discharge." *Id.* at 18 (citation omitted). While it is true, Dr. Chin observed that Plaintiff had not had any unexplained nausea or lethargy due to his Addison's disease in the week and a half since he had been discharged from the hospital, she also noted that he was stress-dosing hydrocortisone. AR at 347.

The ALJ also confirmed that Plaintiff's medical records "noted his diabetes was poorly controlled," but went on to state that "it did improve with return to his baseline steroid treatment." *Id.* at 18 (citation omitted). The January 10, 2020, record actually states, "He has uncontrolled hyperglycemia, but his **recent** numbers have improved somewhat after he returned to his baseline dose of steroids." *Id.* at 328 (emphasis added). Furthermore, the same record shows Plaintiff's A1c far above the target range, and subsequent records consistently demonstrate that Plaintiff's diabetes is not well controlled. *Id.* at 471–76, 511–16, 518–20, 521, 525, 530, 532–36. The ALJ further indicated that "the record shows no vision or neurological concerns secondary to diabetes." *Id.* at 18 (citation omitted). Again, the ALJ is incorrect. On March 4, 2021, treatment records reflect that although his hypoglycemic episodes were reduced to approximately two (2) per week, he still suffered symptoms including cognitive changes, feeling goofy or drunk-ish, and slurring his words. AR at 512.

Finally, in discounting Plaintiff's symptom testimony, the ALJ observed that Plaintiff's statements "about the intensity, persistence, and limiting effects of his or her symptoms . . . are inconsistent because the record does not show objective evidence of the level of fatigue or limitations alleged[,] . . . [and] does not show the claimant reporting or seeking treatment for fatigue or significant or profound fatigue being noted by providers." *Id.* at 18. As an initial matter, "[t]he claimant need not produce objective medical evidence of the pain or fatigue itself, or the severity thereof." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996) (citations omitted). "Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom." *Id.* (citations omitted). Furthermore, Plaintiff **was** seen with complaints of

- 16 -

fatigue.  *See* AR at 441–47.  Moreover, Plaintiff's schedule for checking his blood sugar does not allow for consistent, regular sleep.  The ALJ also noted that Plaintiff has been working outside much of the day, but she failed to account for his need for rest on days following exertion.  The ALJ is reminded that "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F.3d at 1287 n.7 (citations omitted).  Plaintiff's ability to do yardwork is not necessarily consistent with full time work activities.  Finally, the ALJ's observation that "the record also shows that [Plaintiff's] symptoms, such as abdominal pain, have improved with medication[,]" completely misses that improvement does not equate with his illnesses being well-controlled.  AR at 18.  "[T]he ALJ improperly singled out a few periods of temporary well-being from a sustained period of impairment and relied on those instances to discredit [Plaintiff]."  *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014).  Substantial evidence does not support the ALJ's decision.  *See Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007); *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008).  The Court finds that this error was not harmless.

### D. Remand

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits."  *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy."  *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in assessing the Plaintiff's symptom testimony.  This analysis requires reconsideration of all evidence in this case.  Although the Court is inclined to remand for an award of benefits, it will allow the ALJ the opportunity to correct her errors and remand on an open record.

**IV.    CONCLUSION**

Based on the foregoing, the Court finds the ALJ committed legal error in assessing Plaintiff's symptom testimony.  Such error requires reversal and remand, and the Court will direct reanalysis on an open record.

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Opening Brief (Doc. 16) is **GRANTED**.

**IT IS FURTHER ORDERED** that the Commissioner's decision is **REVERSED** and **REMANDED** for further consideration.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment and close its file in this case.

Dated this 29th day of September, 2023.

Eric J. Markovich
United States Magistrate Judge